BRUCE S. GELBER
Deputy Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

DAVID L. McILWAIN
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
601 D Street, N.W., PHB Building
Telephone: (202) 514-1544
Facsimile: (202) 514-0097
E-mail: David.McIlwain@usdoj.gov

DANIEL G. BOGDEN
United States Attorney
District of Nevada
GREG ADDINGTON
Assistant United States Attorney
100 West Liberty
Suite 600
Reno, NV 89501
Telephone: (775) 784-5438
Facsimile: (775) 784-5181

*Attorneys for Plaintiff United States of America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No.  3:17-cv-00302-MMD-WGC |
| | ) | |
| Plaintiff, | ) | |
| | ) | CONSENT DECREE |
| v. | ) | |
| | ) | |
| NEVADA CEMENT COMPANY | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**TABLE OF CONTENTS**

SECTION I: JURISDICTION AND VENUE ............................................................. 3
SECTION II: APPLICABILITY ............................................................................. 4
SECTION III: DEFINITIONS ............................................................................... 6
SECTION IV: CIVIL PENALTY ........................................................................... 13
SECTION V: NOX CONTROL TECHNOLOGY, EMISSION LIMITS AND
    MONITORING REQUIREMENTS ...................................................... 14
    A.    $NO_x$ Control Technology and Emission Limits ............................... 14
    B.    $NO_x$ and Ammonia Continuous Emission Monitoring Systems ........ 16
SECTION VI: SO2 EMISSION LIMITS AND MONITORING REQUIREMENTS ........... 17
    A.    $SO_2$ Emission Limits ............................................................. 17
    B.    $SO_2$ Continuous Emission Monitoring Systems .......................... 17
SECTION VII: OTHER INJUNCTIVE RELIEF ...................................................... 18
SECTION VIII: TEMPORARY CESSATION OF KILN OPERATION ......................... 20
SECTION IX: PROHIBITION ON NETTING CREDITS OR OFFSETS FROM
    REQUIRED CONTROLS.................................................................. 22
SECTION X: PERMITS ..................................................................................... 23
SECTION XI: REVIEW AND APPROVAL OF SUBMITTALS ................................. 26
SECTION XII: REPORTING REQUIREMENTS .................................................... 27
SECTION XIII: STIPULATED PENALTIES ......................................................... 31
SECTION XIV: FORCE MAJEURE ..................................................................... 36
SECTION XV: DISPUTE RESOLUTION .............................................................. 38
SECTION XVI: INFORMATION COLLECTION AND RETENTION ........................... 44
SECTION XVII: EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ............... 46
SECTION XVIII: COSTS .................................................................................. 48
SECTION XIX: NOTICES ................................................................................. 48
SECTION XX: EFFECTIVE DATE ...................................................................... 50
SECTION XXI: RETENTION OF JURISDICTION ................................................. 50
SECTION XXII: MODIFICATION ....................................................................... 50
SECTION XXIII: TERMINATION ....................................................................... 51
SECTION XXIV: PUBLIC PARTICIPATION ........................................................ 52
SECTION XXV: SIGNATORIES/SERVICE/ANSWER ............................................ 52
SECTION XXVI: INTEGRATION ....................................................................... 53
SECTION XXVII: FINAL JUDGMENT ................................................................ 53
SECTION XXVIII: APPENDICES ...................................................................... 53
SECTION XXIX: HEADINGS ............................................................................. 54

i

WHEREAS, Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency (herein "U.S. EPA" or "EPA") has, simultaneously with the lodging of this Consent Decree, filed a Complaint against Defendant Nevada Cement Company ("Defendant" or "Nevada Cement Company"), pursuant to Sections 113(b) and 167 of the Clean Air Act ("Clean Air Act or Act"), 42 U.S.C. §§ 7413(b) and 7477, for injunctive relief and the assessment of civil penalties for violations of the following statutory and regulatory requirements of the Act at the Defendant's Portland cement plant located in Fernley, Nevada: the Prevention of Significant Deterioration ("PSD") provisions of the Act, Sections 160-169, 42 U.S.C. §§ 7470-7492; the New Source Performance Standards ("NSPS") provisions of the Act, Section 111, 42 U.S.C. § 7411; and the federally-approved and enforceable state implementation plan ("SIP"), which incorporate and/or implement the above-listed federal PSD requirements;

WHEREAS, this Consent Decree sets forth injunctive relief in which Defendant has agreed to substantially reduce its emissions of nitrogen oxide and limit its emissions of sulfur dioxide in such a manner that would resolve Defendant's alleged violations of the PSD and NSPS requirements of the Act;

WHEREAS, U.S. EPA has provided notice of the violations alleged herein to the Defendant and to the State of Nevada where Defendant's Facility is located, pursuant to Section 113(a) of the Act, 42 U.S.C. § 7413(a), and Defendant stipulates that it has received actual notice of the violations alleged in the Complaint and that it does not contest the adequacy of the notice provided;

WHEREAS, Defendant denies the allegations of the Complaint and does not admit that it has any liability to the United States for civil penalties or injunctive relief arising out of the transactions and occurrences alleged in the Complaint;

2

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## SECTION I:  JURISDICTION AND VENUE

1.    This Court has jurisdiction of the subject matter herein and over the Parties consenting hereto pursuant to Sections 113(b), 167, and 304(a) of the Act, 42 U.S.C. §§ 7413(b), 7477, and 7604(a), and pursuant to 28 U.S.C. §§ 1331, 1345, 1355 and 1367(a).  Venue is proper under Sections 113(b) and 304(c) of the Act, 42 U.S.C. §§ 7413(b) and 7604(c), and under 28 U.S.C. §§ 1391(b) and (c) and 1395(a).  For purposes of this Consent Decree and the underlying Complaint, Defendant waives all objections and defenses it may have to the Court's jurisdiction over this action, to the Court's jurisdiction over the Defendant, and to venue in this District.  For the purposes of the allegations in the Complaint in this matter that are being resolved by the Consent Decree, Defendant waives any defense or objection based on standing.

2.    For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 113, 165 and 167 of the Act, 42 U.S.C. §§7413, 7475 and 7477.

## SECTION II:  APPLICABILITY

3.   The obligations of this Consent Decree apply to and are binding upon the United States and upon the Defendant, and any successors, assigns, or other entities or persons otherwise bound by law.

4.   At least 30 Days prior to any transfer of ownership or operation of the Facility, Defendant shall provide a copy of this Consent Decree to the proposed transferee and, by the same deadline, shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement to transfer ownership of the Facility, to U.S. EPA and the United States in accordance with Section XIX (Notices) of this Consent Decree.  No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented, unless:

    a.   the transferee agrees, in writing, to undertake the obligations required by Sections V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements), VI ($SO_2$ Emission Limits and Monitoring Requirements), VII (Other Injunctive Relief), VIII (Temporary Cessation of Kiln Operations), IX (Prohibition on Netting Credits or Offsets from Required Controls), X (Permits), XI (Review and Approval of Submittals), XII (Reporting Requirements), XIII (Stipulated Penalties), XIV (Force Majeure), XV (Dispute Resolution), XVI (Information Collection and Retention) and the requirements of Appendices A and B of this Consent Decree applicable to the Facility or Kilns and further agrees in writing to be substituted for the

Defendant as a Party under the Decree with respect to Facility or Kilns and thus become bound by the terms thereof;

b. the United States determines that the transferee has the financial and technical ability to assume the Consent Decree's obligations applicable to such Facility or Kilns;

c. the United States consents, in writing, to relieve Defendant of its Consent Decree obligations applicable to the Facility or Kilns; and

d. the Court approves the transferee becoming a party to this Consent Decree with respect to the transferred Facility or Kilns, pursuant to Section XXII (Modification).

5. Any transfer of ownership or operation of the Facility or Kilns, or any portion thereof, without complying with Paragraph 4, constitutes a violation of this Consent Decree.

6. The Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any Contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

7. In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## SECTION III:  DEFINITIONS

8.  Terms used in this Consent Decree that are defined in the Act or in regulations promulgated by U.S. EPA pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree.  Definitions stated in this Consent Decree are exclusively for the purpose of interpreting and applying the Consent Decree terms and are not intended to establish any type of determination under circumstances not covered by the Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.  "30-Day Rolling Average Emission Limit" shall mean, with respect to the Kilns, the maximum allowable rate of emission of a specified air pollutant from such Kiln and shall be expressed as pounds (lbs.) of such air pollutant emitted per Ton of clinker produced.  Compliance with the 30-Day Rolling Average Emission Limit shall be determined in accordance with the definition of 30-Day Rolling Average Emission Rate.  A new compliance determination of the 30-Day Rolling Average Emission Limit shall be calculated for each new Operating Day in accordance with the provisions of this Consent Decree.  In calculating each compliance determination of the 30-Day Rolling Average Emission Limit in accordance with this Paragraph 8.a, for $NO_x$ or $SO_2$ at the Kilns, the total pounds of such air pollutant emitted from the Kiln during a specified period (Operating Day or 30-Day Period) shall include all emissions of that pollutant from the subject Kiln that occur during the specified period;

6

b. "30-Day Rolling Average Emission Rate" shall mean, with respect to the Kilns, the rate of emission of a specified air pollutant from such Kiln and shall be expressed as pounds (lbs.) of such air pollutant emitted per Ton of clinker produced. Compliance with the 30-Day Rolling Average Emission Limit shall be determined by calculation of a 30-Day Rolling Average Emission Rate in accordance with the following procedure: first, sum the total pounds of the air pollutant in question emitted from the Kiln during that Operating Day and the previous twenty-nine (29) Operating Days as measured pursuant to Section V.B. ($NO_x$ and Ammonia Continuous Emission Monitoring Systems), or Section VI.B. ($SO_2$ Continuous Emission Monitoring Systems), as applicable; second, sum the total Tons of clinker produced by the Kiln during the same Operating Day and previous 29 Operating Days; and third, divide the total number of pounds of the air pollutant emitted from the Kiln during the thirty (30) Operating Days by the total Tons of clinker produced by such Kiln during the same 30 Operating Days. A new compliance determination of the 30-Day Rolling Average Emission Rate shall be calculated for each new Operating Day in accordance with the provisions of this Consent Decree. In calculating each 30-Day Rolling Average Emission Rate in accordance with this Paragraph 8.b, for $NO_x$ or $SO_2$ at the Kilns, the total pounds of such air pollutant emitted from the Kiln during a specified period (Operating Day or 30-Day Period) shall include all emissions of that pollutant from the subject Kiln that occur during the specified period;

c. "Ammonia CEMS" shall mean, for obligations involving ammonia under this Consent Decree, the total equipment and software required to sample, analyze, and to provide a

7

record of ammonia concentration and the raw data necessary to support the reported emissions;

d. "Ammonia Slip" shall mean the amount of unreacted ammonia contained in emissions from Defendant's Kilns. Ammonia Slip shall be calculated by subtracting Baseline Ammonia from Stack Ammonia;

e. "Baseline $NO_x$ Emissions" shall mean the average (arithmetic mean) of all daily emissions of $NO_x$ from each Kiln during the Baseline Collection Period consistent with Appendix A and shall be based upon an analysis of CEMS data and clinker production data from each Kiln;

f. "Baseline Ammonia" shall mean the average (arithmetic mean) of all daily average ammonia concentrations from each Kiln during the Baseline Collection Period consistent with Appendix A and shall be based upon an analysis of CEMS data from each Kiln. Baseline Ammonia shall reflect Ammonia measured by the Ammonia CEMS only during periods of time when the SNCR is not injecting any reagent into the Kilns;

g. "Business Day" means any Day, except for Saturday, Sunday, and federal holidays. In computing any period of time used as a deadline for submission under this Consent Decree, where the last Day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next Business Day;

h. "CEMS" or "Continuous Emission Monitoring System" shall mean, for obligations involving $NO_x$ and $SO_2$ under this Consent Decree, the total equipment and software required to sample and condition (if applicable), to analyze, and to provide a record of $NO_x$ and $SO_2$ emission rates, and the raw data necessary to support the reported

emission rates, and that have been installed, calibrated and certified in accordance with 40 C.F.R. § 60.13 and 40 C.F.R. Part 60 Appendix B and Appendix F;

i. "Commence" or "Commencement" of operation of a Control Technology shall mean to begin the introduction of the reagent employed by the Control Technology, as applicable to that technology, or where the technology is otherwise activated;

j. "Complaint" shall mean the complaint filed by the United States in this action;

k. "Consent Decree" or "Decree" shall mean this Consent Decree and each Appendix attached hereto (listed in Section XXVIII (Appendices)), but in the event of any conflict between the text of this Consent Decree and any Appendix, the text of this Consent Decree shall control;

l. "Continuously Operate" or "Continuous Operation" shall mean that when a Control Technology required by this Consent Decree is used at a Kiln, it shall be operated at all times of Kiln Operation, consistent with the technological limitations, manufacturers' specifications, and good engineering and maintenance practices for such Control Technology and the Kiln. A SNCR that is injecting no reagent is not Continuously Operating; however, the requirement to continuously operate SNCR does not require that the SNCR be operated under conditions where the Kiln has not reached or is no longer maintaining the minimum temperature for reagent injection. This Paragraph is not intended to require any minimum level of reagent injection after the 30-Day Rolling Average Emission Limit has been established in accordance with Paragraph 8.a;

m. "Contractor" shall mean any person or entity hired by Defendant to perform services on its behalf necessary to comply with the provisions of this Consent Decree;

9

n.  "Control Technology" or "NOx Control Technology" shall mean Selective Non-Catalytic Reduction or Low-$NO_x$ Burner technology;

o.  "Date of Lodging of the Consent Decree" or "Date of Lodging" shall mean the date the Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of Nevada;

p.  "Day" shall mean a calendar day unless expressly stated to be a Business Day;

q.  "Defendant" or "Nevada Cement" shall mean Nevada Cement Company;

r.  "Effective Date" shall have the meaning given in Paragraph 98;

s.  "Facility" shall mean the Defendant's Portland cement manufacturing plant located just north of Interstate Highway 80 near Fernley, Nevada;

t.  "Kiln" as used in this Consent Decree shall mean each device located at the Facility, including any associated preheater devices, that produces clinker by heating limestone and other materials for subsequent production of Portland cement. The two Kilns at the Facility are designated Kiln #1, which is a long dry rotary kiln, and Kiln #2, which is a long dry rotary kiln with a single-stage preheater;

u.  "Kiln Operation" shall mean any period when any raw materials are fed into the Kiln or any combustion is occurring in the Kiln;

v.  "Low-$NO_x$ Burner" or "LNB" shall mean commercially available combustion modification $NO_x$ controls that minimize $NO_x$ formation by introducing fuel and its associated combustion air into a kiln such that initial combustion occurs in a fuel-rich (i.e., oxygen deficient) environment and introduces additional air to achieve a final fuel-lean (i.e., oxygen rich) environment to complete the combustion process;

w. "Malfunction" shall mean any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions;

x. "National Ambient Air Quality Standards" or "NAAQS" shall mean national ambient air quality standards that are promulgated pursuant to Section 109 of the Act, 42 U.S.C. § 7409;

y. "New Source Performance Standards" or "NSPS" shall mean those standards and emission limitations applicable to the emissions of $NO_x$, and $SO_2$, from existing, modified or reconstructed Portland cement manufacturing facilities, codified at 40 C.F.R. Part 60, Subpart F;

z. "$NO_x$" shall mean oxides of nitrogen, measured in accordance with the provisions of this Consent Decree;

aa. "Operating Day" shall mean any day in which Kiln Operation has occurred;

bb. "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

cc. "Parties" shall mean the United States and Nevada Cement Company;

dd. "PSD" shall mean the Prevention of Significant Deterioration program within the meaning of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, 40 C.F.R. Part 52, and Nevada's State Implementation Plan implementing the PSD requirements;

ee. "Retire" or "Retirement" shall mean, with respect to any Kiln, (1) to permanently Shutdown the Kiln; and (2) to comply with applicable State and federal requirements for permanent cessation of Kiln operations, including submitting an application in

11

accordance with the Nevada SIP to remove permanently any legal authorization under applicable regulations or permits for further operation of the Kiln;

ff. "Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

gg. "Selective Non-Catalytic Reduction" or "SNCR" shall mean a pollution control system that injects an ammonia-based reagent into the gas stream without the use of a catalyst for the purpose of reducing $NO_x$ emissions;

hh. "Shutdown" shall mean the cessation of Kiln Operation. Shutdown begins when feed to the Kiln is halted and ends when continuous Kiln rotation ceases;

ii. "SNCR Demonstration Period" shall mean that period of time identified in Appendix A, following optimization, and at the conclusion of which, Defendant will propose a 30-Day Rolling Average Emission Limit for $NO_x$ for each Kiln that is achievable through the implementation of SNCR, and that will be applied in accordance with Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements) of this Consent Decree;

jj. "$SO_2$" shall mean the pollutant sulfur dioxide, measured in accordance with the provisions of this Consent Decree;

kk. "Stack Ammonia" shall mean the concentration of ammonia in emissions from the Defendant's Kilns as measured by the Ammonia CEMS during the period when an SNCR is operational for that Kiln. Stack Ammonia is not, without subtraction of Baseline Ammonia, considered Ammonia Slip;

ll. "Startup" shall mean the time from when a Shutdown Kiln turns on the induced draft fan and begins firing fuel in the main burner. Startup ends when feed is being

12

continuously introduced into the Kiln for at least 120 minutes or when the feed rate exceeds 60 percent of the Kiln design limitation rate, whichever occurs first;

mm.   "State" shall mean the State of Nevada, and any agencies or subdivisions having jurisdiction over the Facility, including the Nevada Division of Environmental Protection ("NDEP");

nn. "Temporary Cessation," "Temporary Cessation of Kiln Operation" or "Temporarily Cease Kiln Operation" shall mean the period when a Kiln is not in a state of Kiln Operation and Defendant has provided the required notice pursuant to Paragraph 35 of Section VIII (Temporary Cessation of Kiln Operation) of this Consent Decree;

oo. "Ton" or "Tons" shall mean short ton or short tons;

pp. "United States" shall mean the United States of America, acting on behalf of U.S. EPA; and

qq. "U.S. EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

## SECTION IV:  CIVIL PENALTY

9.   Within thirty (30) Days after the Effective Date of this Consent Decree, Defendant shall pay to the United States as a civil penalty the sum of $550,000, together with interest accruing from the date that the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging. Defendant shall pay the civil penalty due under this Paragraph 9 by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Defendant following lodging of the Consent Decree by the Financial Litigation Unit of the U.S. Attorney's Office for the

13

District of Nevada, 333 Las Vegas Blvd, Suite 5000, Las Vegas, Nevada, 89101. At the time of payment, Defendant shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States v. Nevada Cement Company, and shall reference the civil action number and DOJ case number 90-5-2-1-10458, to the United States in accordance with Section XIX of this Consent Decree (Notices); by email to acctsreceivable.CINWD@epa.gov; and to:

U.S. EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268.

10. Defendant shall not deduct any penalties paid under this Section or Section XIII (Stipulated Penalties) in calculating its federal or state or local income tax.

## SECTION V: NO$_x$ CONTROL TECHNOLOGY, EMISSION LIMITS AND MONITORING REQUIREMENTS

A.    **NOx Control Technology and Emission Limits**

11. Defendant shall install and Continuously Operate SNCR Control Technology on each Kiln to reduce NO$_x$ emissions in accordance with the timeframes and requirements set forth in Section III of Appendix A.

12. Defendant shall comply with all terms and conditions, including drafting submittals and complying with protocols set forth in Appendix A, to establish 30-Day Rolling Average Emission Limits for NO$_x$ applicable to each Kiln.

13. Within 30 Days after approval, conditional approval, or partial approval by U.S. EPA pursuant to Section XI (Review and Approval of Submittals) of any

14

final 30-Day Rolling Average Emission Limit for $NO_x$ established pursuant to Appendix A, Defendant shall achieve and maintain continuous compliance with such 30-Day Rolling Average Emission Limit for $NO_x$. If the 30-day Rolling Average Emission Limit for $NO_x$ is challenged pursuant to the Dispute Resolution provisions of Section XV (Dispute Resolution), the final $NO_x$ Limit shall be the 30-Day Rolling Average agreed to by the Parties at the conclusion of Informal Dispute Resolution. If Informal Dispute Resolution does not resolve the dispute, Defendant shall comply with its Proposed final $NO_x$ Emissions Limit until a final $NO_x$ Emissions Limit is determined by the Court.

14. If the final 30-Day Rolling Average Emission Limit for $NO_x$ as determined in Appendix A.IV.7.d is less than a 40% reduction in Baseline $NO_x$ Emissions of the applicable Kiln, the United States may demand that Defendant install a Low $NO_x$ Burner on such Kiln. The United States will make this demand within 180 days of receipt of the Demonstration Report.

15. If the United States demands that Defendant install a Low $NO_x$ Burner on either Kiln pursuant to Paragraph 14, Defendant shall install a Low $NO_x$ Burner within 24 months of such demand and comply with Appendix A, Section V of this Consent Decree. Following the installation of a Low $NO_x$ Burner on a Kiln, the Defendant shall commence complying with the terms of Appendix A, Section V to establish a new 30-Day Rolling Average Emissions Limit applicable to such Kiln while operating Low $NO_x$ Burner and SNCR.

16. Upon submittal to EPA as part of a SNCR Demonstration Report of a proposed 30 Day Rolling Average Emission Limit for $NO_x$ for a particular Kiln

15

pursuant to Appendix A, Defendant shall meet the proposed Limit for that Kiln until such time as final 30-Day Rolling Average Limit is established pursuant to Paragraph 13.

**B.     NOx and Ammonia Continuous Emission Monitoring Systems**

17. By no later than December 31, 2017, Defendant shall install and make operational a $NO_x$ CEMS and an Ammonia CEMS at the stack of Kiln #2 in accordance with the requirements of Appendix A.

a.   On or before the date that a $NO_x$ CEMS and an Ammonia CEMS is required pursuant to Paragraph 17, Defendant shall begin to record on a continuous basis the daily clinker production rates by continuously meeting the requirements of 40 C.F.R. § 63.1350(d) to determine hourly clinker production rates.

18. Except during CEMS breakdowns, repairs, calibration checks, and zero span adjustments, the CEMS required pursuant to Paragraphs 17 and 19 shall be operated at all times during Kiln Operation.  Such CEMS shall be used to demonstrate compliance with the 30-Day Rolling Average Emission Limit for $NO_x$ established in Section V.A ($NO_x$ Control Technology and Emission Limits) and Appendix A of this Consent Decree.

19. By February 1, 2018, Defendant shall complete installation of a single stack for Kiln #1, install and make operational a $NO_x$ CEMS and an Ammonia CEMS at the stack and start collecting the same production data as Paragraph 17.a.

20. Each $NO_x$ CEMS required by this Consent Decree along with associated flow monitors and weight meters shall monitor and record the applicable $NO_x$ emission rate from each Kiln stack in units of lbs. of $NO_x$ per Ton of clinker produced

16

at the Kiln and shall be installed, certified, calibrated, maintained, and operated in accordance with the requirements of 40 C.F.R. Part 60, Appendices B and F. The Ammonia CEMS shall be installed and operated in a manner that meets the requirements of 40 C.F.R. Part 60, Appendices B and F, and CTM 027.

21. For purposes of this Consent Decree, all emissions of $NO_x$ from the Kilns shall be measured by the $NO_x$ CEMS. During any time when CEMS are inoperable and otherwise not measuring emission of $NO_x$ from either Kiln, Defendant shall apply the missing data substitution procedures in 40 C.F.R. Part 75, Subpart D.

## SECTION VI: $SO_2$ EMISSION LIMITS AND MONITORING REQUIREMENTS

A. **$SO_2$ Emission Limits**

22. By the dates set forth below in Paragraphs 23 and 24, Defendant shall achieve and maintain continuous compliance with the 30-Day Rolling Average Emission Limit for $SO_2$ set forth in Table 1:

### TABLE 1

| Kiln | 30-Day Rolling Average Emission Limit for $SO_2$ (lbs. $SO_2$/Ton of clinker) |
|---|---|
| Kiln #1 | 1.1 lbs $SO_2$/ Ton of clinker |
| Kiln #2 | 1.1 lbs $SO_2$/ Ton of clinker |

B. **$SO_2$ Continuous Emission Monitoring Systems**

23. By no later than December 31, 2017, Defendant shall install and make operational an $SO_2$ CEMS at the stack of Kiln #2.

17

24. No later than February 1, 2018, Defendant shall install and make operational an $SO_2$ CEMS at the stack of Kiln #1.

25. Except during CEMS breakdowns, repairs, calibration checks, and zero span adjustments, the $SO_2$ CEMS required pursuant to Paragraphs 23 and 24 shall be operated at all times during Kiln Operation. Each such $SO_2$ CEMS shall be used at each Kiln to demonstrate compliance with the 30-Day Rolling Average Emission Limit for $SO_2$ established in Section VI.A ($SO_2$ Emission Limits) of this Consent Decree.

26. Each $SO_2$ CEMS required for this Consent Decree, along with associated flow monitor and weight meters, shall monitor and record the applicable $SO_2$ emission rate from each Kiln stack in units of lb of $SO_2$ per Ton of clinker produced at each Kiln and shall be installed, certified, calibrated, maintained, and operated in accordance with the applicable requirements of 40 C.F.R. Part 60.

27. For purposes of this Consent Decree, all emissions of $SO_2$ from the Kilns shall be measured by $SO_2$ CEMS. During any time when the CEMS are inoperable and otherwise not measuring emissions of $SO_2$ from any Kiln, Defendant shall apply the missing data substitution procedures in 40 C.F.R. Part 75, Subpart D.

## SECTION VII: OTHER INJUNCTIVE RELIEF

### Good Pollution Control Practices

28. At all times, Defendant shall maintain and operate the Kilns, including all associated air pollution control equipment, in a manner consistent with good air pollution control practice.

18

**Mitigation**

29. Within two years of the Date of Entry of this Consent Decree, Defendant shall replace an existing heavy-duty diesel truck and an existing rail car mover that are identified in Appendix B of this Consent Decree with a new diesel truck and a new rail car mover with required emissions controls, as described more fully in Appendix B (the "Projects"). Defendant shall spend no less than $420,000 for the Projects ("Project Dollars").

30. Defendant, shall maintain, and, within 30 Days upon U.S. EPA's request, provide to U.S. EPA all documents that substantiate work completed on the Projects in accordance with Section XIX (Notices).

31. Defendant certifies that Defendant is not otherwise required by law to perform the Projects, that Defendant is unaware of any other person who is required by law to perform the Projects, and that Defendant will not use the Projects, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law. Defendant certifies that it has not, and will not, deduct any costs in implementing Section VII (Other Injunctive Relief), in calculating its federal or state income taxes.

32. Beginning six (6) months after the Effective Date of this Consent Decree, and continuing until completion of the Projects, Defendant shall provide U.S. EPA with semi-annual or annual updates concerning the progress of the Projects in the semi-annual or annual reports required (as applicable) in Section XII (Reporting Requirements) of this Consent Decree.

33. Defendant shall use good faith efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree. Within sixty (60) Days following the completion of the Projects required under this Consent Decree, Defendant shall submit to U.S. EPA a report that documents the date that the Projects were completed, Defendant's results from implementing the Projects, including the emission reductions or other environmental benefits achieved (including any emission reductions achieved for $NO_x$, or $SO_2$), and the Project Dollars expended by Defendant in implementing the Projects.

34. In connection with any communication to the public or to shareholders regarding Defendant's actions or expenditures relating in any way to the Projects, Defendant shall include prominently in the communication the information that the actions and expenditures were required as part of a negotiated consent decree to resolve allegations that Defendant violated the Clean Air Act.

## SECTION VIII: TEMPORARY CESSATION OF KILN OPERATION

35. If Defendant has Temporarily Ceased Kiln Operation of any Kiln on the date by which Defendant is required to install and/or Continuously Operate any Control Technology at that Kiln under Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements), or Section VI ($SO_2$ Emission Limits and Monitoring Requirements), Defendant shall provide written notice to U.S. EPA within ten (10) Days after such Temporary Cessation began, specifying the date on which such period of Temporary Cessation began. Defendant shall provide such written notice pursuant to Section XIX (Notices).

20

36. If Defendant has provided the written notice as required in Paragraph 35, above, Defendant shall not be required to install and Continuously Operate the Control Technology at that Kiln by the dates required in Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements) and Section VI ($SO_2$ Emission Limits and Monitoring Requirements) of this Consent Decree with respect to that Kiln. However, Defendant shall not recommence Kiln Operation after the dates required in Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements) of this Consent Decree with respect to that Kiln unless the Defendant has: 1) installed and Commenced Continuous Operation of the Control Technologies required by this Consent Decree for that Kiln; 2) commenced compliance with all requirements for that Kiln contained in Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements) and Section VI ($SO_2$ Emission Limits and Monitoring Requirements); and 3) provided written notice to U.S. EPA within 30 Days after recommencing Kiln Operation. If Defendant recommences Kiln Operation without installing and Commencing Continuous Operation of the Control Technology required under this Consent Decree and does not demonstrate compliance with all requirements for that Kiln contained in Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements) and Section VI ($SO_2$ Emission Limits and Monitoring Requirements), Defendant shall be liable for stipulated penalties pursuant to Section XIII (Stipulated Penalties).

## SECTION IX:  PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED CONTROLS

37. Except as specifically stated to the contrary in this Consent Decree, $NO_x$ and $SO_2$ emission reductions resulting from compliance with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a netting credit under the Clean Air Act's Non-attainment NSR and PSD programs.

38. The limitations on the generation and use of netting credits or offsets set forth in Paragraph 37 do not apply to emission reductions achieved by Defendant that are surplus to those required under this Consent Decree ("surplus emission reductions").  For purposes of this Paragraph, surplus emission reductions are the reductions over and above those required under this Consent Decree, including any final 30-Day Rolling Average Emission Limit for $NO_x$ established pursuant to Appendix A, that result from Defendant's compliance with federally enforceable emissions limits that are more stringent than limits imposed under this Consent Decree or from Defendant's compliance with emissions limits otherwise required under applicable provisions of the Clean Air Act or with an applicable SIP that contains more stringent limits than those imposed under this Consent Decree.

39. Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by U.S. EPA or a State as creditable contemporaneous emission decreases for the purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on NAAQS, PSD increments, or air quality-related values,

or for demonstrating reasonable progress under the regional haze program of the Clean Air Act pursuant to 42 U.S.C. §§ 7491-92.

## **SECTION X:  PERMITS**

40. Where any compliance obligation under this Consent Decree requires Defendant to obtain a federal, State, or local permit or approval, Defendant shall submit a timely and complete application for such permit or approval and take all other actions necessary to obtain all such permits or approvals, allowing for all legally required processing and review including requests for additional information by the permitting or approval authority.  The inability of Defendant to obtain a permit in adequate time to allow compliance with the deadlines stated in this Consent Decree may be considered a Force Majeure event if Defendant demonstrates that it exercised best efforts to timely fulfill its permitting obligations and has otherwise satisfied the requirements of Section XIV (Force Majeure) of this Consent Decree.  If, after demonstrating compliance with the requirements of this Paragraph, Defendant determines that it is unable to timely obtain a permit or approval necessary to install and Continuously Operate Control Technology under this Consent Decree, then Defendant shall within 10 days notify EPA in writing pursuant to Section XIV (Force Majeure) of this Consent Decree and shall request an extension of time necessary to obtain such permit or approval and install and shake down the required improvements.  If EPA determines that Defendant's inability to timely obtain any such required permit or approval is a Force Majeure event, then the provisions of Paragraph 67 shall apply to extend the deadline for installation and commencement of

Continuous Operation of the Control Technology and for achieving and maintaining

compliance with the applicable 30-Day Rolling Average Emission Limits.

41. In addition to having first obtained any required preconstruction permits or

other approvals pursuant to Paragraph 40, within 3 months after the establishment of

the final 30-Day Rolling Average Emission Limit for $NO_x$ established pursuant to

Section V ($NO_x$ Control Technology, Emissions Limits and Monitoring

Requirements), including Final Dispute Resolution if applicable, Defendant shall

apply to NDEP to include the applicable requirements of Sections V.A (NOx Control

Technology and Emission Limits) and VI.A ($SO_2$ Emission Limits), and any

monitoring requirements, including those in Sections V.B ($NO_x$ Continuous Emission

Monitoring System) and VI.B ($SO_2$ Continuous Emission Monitoring Systems) of

this Consent Decree in a federally enforceable operating permit or other permit or

approval issued under the SIP of Nevada and under authority independent of the

NDEP's authority to issue Title V permits. For the purpose of this Paragraph, the

ammonia monitoring requirements identified in Section V do not constitute NOx

monitoring requirements. Following submission of the application for the permit or

approval, Defendant shall cooperate with NDEP by promptly submitting all

information that such permitting authority seeks following its receipt of the

application for the permit. The methods specified in this Consent Decree for

demonstrating compliance with the limits in this Consent Decree are not intended to

change the means by which Defendant demonstrates compliance with standards not

addressed by this Consent Decree. The requirements of this Paragraph are satisfied if

a preconstruction permit was obtained, that permit serves as a state operating permit

24

under the Nevada SIP and that permit contains the elements identified in this Paragraph.

42. Upon issuance of any permit or approval required under Paragraphs 40 and 41, Defendant shall file any applications necessary to incorporate the requirements of that permit into the Title V operating permit of the Facility. Defendant shall not challenge the inclusion in any such permit of the Emission Limits expressly prescribed in this Consent Decree (including, where applicable, 30-Day Rolling Average Emission Limits for $NO_x$ determined in accordance with Appendix A) or of any other requirement of this Consent Decree.

43. For each Kiln, Defendant shall provide U.S. EPA with a copy of each application for a permit to address or comply with any provision of this Consent Decree, as well as a copy of any permit proposed as a result of such application, to allow for timely U.S. EPA participation in any public comment opportunity.

44. In lieu of incorporating the terms of the Consent Decree directly into a permit issued under a SIP pursuant to Paragraph 41, Defendant may request that NDEP submit the portions of the Consent Decree applicable to the Facility in Nevada to the U.S. EPA for approval under the State's SIP in accordance with 42 U.S.C. § 7410(k). Upon approval by the U.S. EPA, those portions of this Consent Decree will be incorporated into the Nevada SIP, and subsequently incorporated into Title V permits for the Facility consistent with applicable requirements in 40 C.F.R. Part 70 or Nevada-specific rules adopted and approved consistent with Part 70. Defendant agrees not to contest the submittal of any such proposed SIP revision that incorporates the terms of this Consent Decree to U.S. EPA, or U.S. EPA's approval

25

of such submittal, or the incorporation of the applicable portions of this Consent Decree through these SIP requirements into the Title V permits.

## SECTION XI:  REVIEW AND APPROVAL OF SUBMITTALS

45. After review of any plan, report, or other document that is required to be submitted pursuant to this Consent Decree, U.S. EPA, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

46. If the submission is approved pursuant to Paragraph 45, Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part, pursuant to Paragraph 45.b or c, Defendant shall, upon written direction of U.S. EPA, take all actions required by the approved plan, report, or other item that U.S. EPA determines are technically severable from any disapproved portions, subject to Defendant's right to dispute the specified conditions or the disapproved portions, under Section XV (Dispute Resolution) of this Consent Decree  and the severability of such portions.

47. If the submission is disapproved in whole or in part pursuant to Paragraph 45.c or d, Defendant shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.

26

48. Any stipulated penalties applicable to an original submission that is disapproved in whole or in part pursuant to Paragraph 45.c or d, as provided in Section XIII (Stipulated Penalties) of this decree, shall continue to accrue during the period specified in Paragraph 47, but any stipulated penalties that accrue following the receipt of the submission shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

49. If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, U.S. EPA may again require Defendant to correct any deficiencies in accordance with the preceding Paragraphs, or may itself correct any deficiencies and seek stipulated penalties, subject to Defendant's right to invoke Dispute Resolution under Section XV (Dispute Resolution) of this Consent Decree.

## SECTION XII: REPORTING REQUIREMENTS

50. Within 30 Days after the end of each half calendar year (*i.e.*, June 30, December 31) after the Effective Date, until termination of this Consent Decree pursuant to Section XXIII (Termination), Defendant shall submit a semi-annual report to U.S. EPA for the immediately preceding half calendar year period that shall:

a. Identify any and all dates on which Defendant has installed, or describe the progress of installation of, each Control Technology required for each Kiln under Section V ($NO_x$ Control Technology, Emission Limits and Monitoring

27

Requirements) and describe any problems encountered or anticipated during such installation, together with implemented or proposed solutions;

b. Identify any and all dates on which Defendant has completed installation of, or describe the progress of installation of, each continuous monitoring system required under Section V.B ($NO_x$ and Ammonia Continuous Emission Monitoring Systems) and Section VI.B ($SO_2$ Continuous Emission Monitoring Systems) and describe any problems encountered or anticipated during such installation, together with implemented or proposed solutions;

c. Provide, in electronic format able to be manipulated with Microsoft Excel, all CEMS data collected for each Kiln, reduced to 1 hour averages, in accordance with 40 C.F.R. § 60.13(h)(2), including an explanation of any periods of CEMS downtime together with any missing data for which Defendant applied missing data substitution procedures, under Section V.B ($NO_x$ and Ammonia Continuous Emission Monitoring Systems) or Section VI.B ($SO_2$ Continuous Emission Monitoring Systems);

d. Demonstrate compliance with all applicable 30-Day Rolling Average Emission Limits of this Consent Decree;

e. Provide a complete description and status of all actions Defendant has undertaken to comply with each of the Appendices of this Consent Decree;

f. Describe the status of permit applications and any proposed SIP revisions made to implement the requirements of this Consent Decree; and

g. Describe the status of any operation and maintenance work relating to activities required under this Consent Decree.

28

The semi-annual report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the likely cause of non-compliance and of the remedial steps taken, or to be taken, to prevent or minimize such non-compliance.

51. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States of such violation and its likely duration, in writing (including by email), within ten (10) Business Days of the Day Defendant first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation and to mitigate any adverse effects of such violation. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report required under Paragraph 50, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section XIV (Force Majeure) of this Consent Decree or to avail itself of Section XIV (Force Majeure) if Defendant contends a Force Majeure event occurred.

52. Whenever any violation of this Consent Decree, or of any applicable permits required under this Consent Decree, or any other event affecting Defendant's performance under this Consent Decree, or the performance of the Kilns, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify U.S. EPA, orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first knew, or should have known, of the

29

violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

53. All reports shall be submitted to the persons designated in Section XIX (Notices) of this Consent Decree.

54. Each report submitted by Defendant under this Section or Appendix A or Appendix B shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical. Failure to certify as immediately above is a violation of the Consent Decree and is subject to stipulated penalties.

55. The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Clean Air Act or implementing regulations, or by any other federal, State, or local law, regulation, permit, or other requirement.

56. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## SECTION XIII:  STIPULATED PENALTIES

57. Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in Table 2 below, unless excused under Section XIV (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.  Once the final NOx emission limit is established pursuant to Appendix A, the parameters used to establish the final NOx emission limit shall not be enforceable or subject to stipulated penalties. Violation of an Emission Limit that is based on a 30-Day Rolling Average is a violation on every Day on which the average is based.  Each subsequent Day of violation after a violation of a 30-Day Rolling Average Emission Limit is subject to the corresponding penalty per Day specified in Table 2, below. Where a violation of a 30-Day Rolling Average Emission Limit (for the same pollutant and from the same source) recurs within periods of less than thirty (30) Days, Defendant shall not pay a daily stipulated penalty for any Day of recurrence for which a stipulated penalty is already payable.  Stipulated penalties may only be assessed once for a given Day within any averaging period for violation of any particular Emission Limit.  Stipulated penalties for consecutive periods of violation of an Emission Limit shall be calculated based upon the violation of the Emission Limit for the same pollutant from the same Kiln.

**TABLE 2**

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| a. Failure to pay the civil penalty in the manner specified in Section IV (Civil Penalty) of this Consent Decree | $7,500 for each Day |
| b. Failure to comply with a 30-Day Rolling Average Emission Limit for $NO_x$ or $SO_2$ where the emissions are less than 5% in excess of the limits set forth in this Consent Decree | $1,000 for each Operating Day during any 30-Day rolling period where the violation is less than 5% in excess of the Limit |
| c. Failure to comply with a 30-Day Rolling Average Emission Limit for $NO_x$ or $SO_2$ where the emissions are equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $2,000 for each Operating Day during any 30-Day rolling period where the violation is equal to or greater than 5% but less than 10% in excess of the Limit |
| d. Failure to comply with a 30-Day Rolling Average Emission Limit for $NO_x$ or $SO_2$ where the emissions are equal to or greater than 10% in excess of the limits set forth in this Consent Decree | $4,000 for each Operating Day during any 30-Day rolling period where the violation is equal to or greater than 10% in excess of the Limit |
| e. Failure to install or Commence Continuous Operation or Continuously Operate Control Technology at a Kiln required by the deadlines established in Section V ($NO_x$ Control Technology, Emission Limits and Monitoring Requirements) and/or Appendix A of this Consent Decree | $5,000 for each consecutive Operating Day during the first 20 Days, $10,000 for each consecutive Operating Day for the next 40 Days, and $32,500 for each consecutive Operating Day thereafter |
| f. Failure to install or operate a CEMS or other monitoring device in conformance with the requirements of Section V.B. ($NO_x$ and Ammonia Continuous Emission Monitoring Systems), Section VI.B ($SO_2$ Continuous Emission Monitoring Systems), or Appendix A, as applicable. CEMS down time and missing data periods are not subject to stipulated penalties | $1,000 for each Operating Day for each such failure per Kiln |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| g.  Failure to apply for any permit or permit amendment or seek a SIP approval required by Section X (Permits) or provide a timely copy to USEPA | $1,000 for each Day for each such failure |
| h.  Failure to timely submit, modify, or implement, as approved, any report, plan, study, analysis, protocol, or other submittal required by this Consent Decree, including electronic versions as required, including those submissions approved pursuant to Section XI (Review and Approval of Submittals) of this Consent Decree | For each separate failure, $750 for each Day during the first 10 Days, $1,000 per Day thereafter |
| i.  Failure to provide new owner or operator of the Facility a copy of this Consent Decree in accordance with Paragraph 4 | $1,000 for each Day for each such failure |
| j.  Failure to provide certifications, progress reports, updates and/or a final report per the schedule in Paragraphs 50, 51, and 52 | $1,000 per Day for each Day late per project |
| k.  Failure to maintain or instruct Contractors to maintain documents, records or other information that relate in any manner to performance of obligations in the Consent Decree, as per Paragraph 84 | $1,000 for each record or Day of data not collected or maintained as required |
| l.  Any other violation of the Consent Decree | $1,000 for each Day for each violation |

58. Subject to the provisions of Paragraph 57 above, stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree but each separate violation shall be subject to no more than one stipulated penalty. All

33

stipulated penalties are subject to challenge by Defendant pursuant to Section XIV (Force Majeure).

59. Defendant shall pay any stipulated penalty within thirty (30) Days of receiving the United States' written demand.

60. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due the United States under this Consent Decree.

61. Stipulated penalties shall accrue as provided in this Section, during any Dispute Resolution, but need not be paid until the following:

a.  If the dispute is resolved by agreement between the Parties or by a decision of the United States that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest accruing from the 31st Day after the written demand in Paragraph 59, within 30 Days of the effective date of the agreement or the receipt of U.S. EPA's decision or order.

b.  If the dispute is appealed to the Court and the United States is the prevailing party, in whole or in part, as may be determined by the Court, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest accruing from the 31st Day after the written demand in Paragraph 59, within 60 Days of receiving the Court's decision or order, except as provided in Subparagraph c below.

c.  If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest accruing from the 31st

Day after the written demand in Paragraph 59, within 15 Days of receiving the final appellate court decision.

62. Defendant shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 9 and with the confirmation notices to the persons specified in Paragraph 95, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

63. The United States may choose between (1) stipulated penalties and (2) any other right, remedy or sanction available to it, but not both. The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree. This Paragraph shall not limit the United States' ability to seek injunctive relief associated with such violations.

64. Defendant shall not deduct stipulated penalties paid under this Section in calculating their federal, state or local income tax.

65. If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States from securing any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

66. Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies,

35

or sanctions available to the United States for Defendant's violation of this Consent Decree or applicable law. Where a violation of this Consent Decree is also a violation of the Clean Air Act, Defendant shall be allowed a dollar-for-dollar credit, for any stipulated penalties paid, against any statutory penalties imposed for such violations.

## SECTION XIV: FORCE MAJEURE

67. "Force Majeure" (for purposes of this Consent Decree) is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant or Defendant's Contractors, that causes a delay or impediment to performance in complying with any obligation under this Consent Decree despite the Defendant's best efforts to fulfill the obligation. The requirement that the Defendant exercise best efforts to fulfill the obligation includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay and the effects of such event to the greatest extent possible. Force Majeure does not include the Defendant's financial inability to perform any obligation under this Consent Decree. Force Majeure may include Defendant's inability after demonstrating compliance with the requirements of Paragraphs 40 and 41 to obtain a permit or approval such that there is adequate time to install and Continuously Operate Control Technology required under this Consent Decree.

68. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendant shall provide written notice or notice by electronic mail (email) to the representatives of U.S. EPA designated to receive notice pursuant to Section XIX

36

(Notices) within seven (7) Business Days of when Defendant first knew that the event might cause a delay. Within 21 Days thereafter, Defendant shall provide in writing to U.S. EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a Force Majeure. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's Contractors knew or should have known.

69. If U.S. EPA agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by U.S. EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. U.S. EPA will notify

37

Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

70. If U.S. EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, U.S. EPA will notify Defendant in writing of its decision.

71. If Defendant elects to invoke the dispute resolution procedures set forth in Section XV (Dispute Resolution), it shall do so no later than 15 Days after receipt of U.S. EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 67 and 68, above. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to U.S. EPA and the Court.

## SECTION XV: DISPUTE RESOLUTION

72. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States or Affected State to enforce any obligation of Defendant arising under this Consent Decree.

38

73. Informal Dispute Resolution for Emission Limit Setting Process under Appendix A. If Defendant invokes Dispute Resolution regarding an EPA-established alternative final 30-Day Rolling Average Emission Limit for $NO_x$, Defendant shall promptly (within 15 days) initiate the process set forth in this Paragraph to hire an independent Contractor who will be tasked to analyze the 30-Day Rolling Average Emission Limits for $NO_x$ established by EPA and proposed by Defendant and to provide, for the benefit of both U.S. EPA and Defendant, the reports, analysis, and services identified in this Paragraph, below, by the specified deadlines. Defendant shall bear all costs associated with the Contractor's work up to $100,000, and shall provide the Contractor access to records, employees, contracts, and facilities which are reasonably necessary to complete the report required by this Paragraph. If costs to perform the work set forth in the Scope of Work (SOW) requirements described in this Paragraph are expected to be higher than $100,000, Defendant and U.S. EPA will, upon written mutual agreement, limit or modify the nature and/or scope of the work to be performed under this Paragraph to meet the expenditure limitation. For purposes of this Paragraph, "independent" shall mean a qualified professional with at least 5 years of experience relating to the operations of and/or emissions from cement kilns or similar sources and who has not previously been employed or retained by Defendant in any capacity (unless otherwise approved by U.S. EPA).

a. Defendant shall submit to U.S. EPA for approval, the name and qualifications of a proposed Contractor for this engagement at the time it submits its Written Notice of Dispute in accordance with Section XIX (Notices). If U.S. EPA disapproves of the Contractor, Defendant is required to propose to U.S. EPA within 15 Days of

the disapproval a different Contractor, also subject to U.S. EPA's approval. If U.S. EPA disapproves the second Contractor, U.S. EPA may choose and identify to Defendant the Contractor to be employed. Defendant shall enter into a contract with the Contractor, containing the SOW requirements in Paragraph 73.b, below (as modified to meet the expenditure limitations), within 14 Days of U.S. EPA's approval or final identification of the Contractor.

b. As part of the contract, Defendant shall provide to the Contractor a SOW which will include a requirement or direction to:

    i. Analyze all the data collected under Appendix A, as well as the Demonstration Report, and proposed 30-Day Rolling Average Emission Limits for $NO_x$;

    ii. Submit to U.S. EPA and Defendant, a report on the appropriate 30-day rolling average emission limit, consistent with the methodology set forth in and information collected through Appendix A, as applicable, based upon the injection rates and the operational parameters approved as part of the SNCR Design Reports and the SNCR Optimization Reports required by Appendix A, as applicable. The conclusions of this report shall be based on all of the information and data collected during the SNCR Optimization and Demonstration Periods, as applicable, as well as any additional site-specific information available to the Contractor. The report shall include a section on whether the data collected during the Demonstration Period is representative of normal operations of the unit, as

well as a recommended final 30-Day Rolling Average Emission Limit for $NO_x$ using the protocol and procedures in Appendix A, as applicable;

iii. Make available to U.S. EPA any and all data evaluated, and reveal all communications with Defendant in the course of work pursuant to the SOW. The Contractor shall also be tasked in the SOW to attend up to 15 hours of meetings specifically requested by U.S. EPA, to answer questions concerning any analysis or work undertaken pursuant to the SOW. Defendant may attend any such meeting between U.S. EPA and the Contractor. The SOW shall make clear that the Contractor is free to discuss its analysis, findings and the content of their report with U.S. EPA prior to the completion of the report; and

iv. Complete the Contractor report within 45 Days from the time of the effective date of the contract.

c. The results of the Contractor report will inform the parties in the process of engaging in informal dispute resolution on the proposed and final permit limit.

74. If the United States and Defendant are unable to reach agreement on a final 30-Day Rolling Average Emission Limit for $NO_x$ within 20 Days after receipt of the Contractor report by EPA referenced in the prior paragraph, Defendant may request formal dispute resolution under Paragraph 76 of this Consent Decree. The Contractor report shall be part of the Dispute Resolution record in any formal dispute proceedings under this Consent Decree.

75. Informal Dispute Resolution with Respect to All Other Disputes. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the

41

subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

76. <u>Formal Dispute Resolution</u>. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

77. The United States shall serve its Statement of Position within 45 Days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

78. Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIX (Notices) of this

42

Consent Decree, a motion requesting judicial resolution of the dispute. The motion must be filed within 20 Days of receipt of the United States Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

79. The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

80. <u>Standard of Review</u>.

a.  <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 76 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law or the Consent Decree.

b.  <u>Other Disputes</u>. Except as otherwise provided in this Consent Decree, in any other dispute brought under Section XV (Dispute Resolution), Defendant shall

bear the burden of demonstrating that its position complies with this Consent Decree.

81. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 61. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIII (Stipulated Penalties).

## SECTION XVI: INFORMATION COLLECTION AND RETENTION

82. The United States and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into the facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c. conduct performance testing;

d. obtain documentary evidence, including photographs and similar data; and

e. assess Defendant's compliance with this Consent Decree.

83. Upon request, Defendant shall provide U.S. EPA and its authorized representatives copies of analytical data from Kiln performance testing performed by

Defendant. Upon request, U.S. EPA shall provide Defendant copies of analytical data from Kiln performance testing performed by U.S. EPA.

84. Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its Contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its Contractors' or agents' possession or control, or that come into its or its Contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

85. Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

86. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## SECTION XVII:  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

87. Resolution of Liability.  Entry of this Consent Decree shall resolve the civil claims of the United States for the violations alleged in the Complaint filed in this action and in the two Notices of Violation (NOVs) issued by the U.S. EPA dated October 5, 2010 and March 12, 2014, through the date the Consent Decree is lodged with the Court.

88. Notwithstanding the resolution of liability in Paragraph 87, nothing in this Consent Decree precludes the United States from seeking from Defendant injunctive relief, penalties, or other appropriate relief for violations by Defendant of the regulatory requirements identified in Paragraph 87 resulting from (1) construction or modification that commenced prior to the Date of Lodging of the Consent Decree, if the resulting violations do not arise from the conduct specifically resolved by Paragraph 87 or do not relate to $NO_x$, or $SO_2$ or (2) any construction, reconstruction or modification that commences after the Date of Lodging of the Consent Decree.

89. The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or State laws, regulations, or permit conditions, except as expressly specified in Paragraphs 87 and 63.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Defendant's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

46

90. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facility or Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 87 of this Consent Decree.

91. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and the Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, 42 U.S.C. §§ 7401 *et seq.*, or with any other provisions of federal, State, or local laws, regulations, or permits.

92. This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

93. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## SECTION XVIII:  COSTS

94. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## SECTION XIX:  NOTICES

95. Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

To U.S. EPA by USPS mail:

Phillip A. Brooks
Director, Air Enforcement Division
U.S. Environmental Protection Agency
MC 2242A
ATTN: Shaun Burke
1200 Pennsylvania Ave. NW
Washington, D.C. 20460

And

Chief, Air and TRI Section
Enforcement Division
ATTN: Charles Aldred
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

Email notices should be sent to Aldred.Charles@epa.gov .

To the United States (in addition to the U.S. EPA addresses above):

EES Case Management Unit

48

Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611
Re: DOJ No. 90-5-2-1-10458

To the United States by email:

eescopy.enrd@usdoj.gov

Include in the Subject line: Re: DJ# 90-5-2-1-10458 U.S. v. Nevada Cement Co., Inc.

<u>To Nevada Cement Company:</u>

Joe Sells,
President,
Nevada Cement Company
I-80 at Exit 46
P.O. Box 840
Fernley, NV 89408-0840

Chuck Kellett
Senior Corporate Engineer
Eagle Materials
3811 Turtle Creek Blvd., Suite 1100
Dallas, TX 75219

James Graass
Executive Vice President, General Counsel, Eagle Materials
3811 Turtle Creek Blvd., Suite 1100
Dallas, TX 75219

96. Any Party may, by written notice to the other Party, change its designated notice recipient or notice address provided above. In addition, any Party may submit any written notification, submission, or communication under this Consent Decree by electronic means.

97. Notices submitted pursuant to this Section shall be deemed submitted upon mailing or emailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## SECTION XX: EFFECTIVE DATE

98. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first ("Date of Entry") as recorded on the Court's docket.

## SECTION XXI: RETENTION OF JURISDICTION

99. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XV (Dispute Resolution) and XXII (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## SECTION XXII: MODIFICATION

100. The terms of this Consent Decree, including the Appendices, may be modified only by a subsequent written agreement signed by the United States and Defendant. With the exception of submittals under Appendices A and B that are approved or conditionally approved pursuant to Section XI (Review and Approval of Submittals), and which are incorporated by reference in this Consent Decree upon such approval or conditional approval, where any other modification constitutes a material change to this Consent Decree it shall be effective only upon approval by the Court.

101. Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XV (Dispute Resolution) of this Consent Decree, provided, however, that, instead of the burden of proof provided by Paragraph 80, the

50

Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## SECTION XXIII: TERMINATION

102. _Complete Termination._ After Defendant has complied with the requirements of Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements), Section VI ($SO_2$ Emission Limits, and Monitoring Requirements), and Section X (Permits) of this Consent Decree, including Continuously Operating any Control Technology as required by this Consent Decree for both Kilns, for a period of five years after establishment of the $NO_x$ Final Emissions Limits pursuant to Section V ($NO_x$ Control Technology, Emission Limits, and Monitoring Requirements), has complied with all other requirements of this Consent Decree, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States a Request for Termination of the Consent Decree, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation. If the United States agrees that the Decree as it relates to both Kilns may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating those provisions of the Decree.

103. If the United States does not agree that the Decree as a whole, or as it relates to an individual Kiln, may be terminated, Defendant may invoke Dispute Resolution under Section XV (Dispute Resolution) of this Consent Decree. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination under this Section until sixty (60) Days after service of its Request for Termination.

51

## SECTION XXIV: PUBLIC PARTICIPATION

104.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Consent Decree.

## SECTION XXV: SIGNATORIES/SERVICE/ANSWER

105.    The Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice and each undersigned representative of Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

106.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant shall identify, on the attached signature page, the name, address and telephone number of an agent who is

52

authorized to accept service of process by mail on behalf of Defendant with respect to all matters arising under or relating to this Consent Decree. All Parties agree that Defendant need not file an answer or otherwise respond to the Complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## SECTION XXVI: INTEGRATION

107.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. No other document, nor any representation, inducement, agreement, understanding or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

## SECTION XXVII: FINAL JUDGMENT

108.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and the Defendant.

## SECTION XXVIII: APPENDICES

109.     The following Appendices are attached to and incorporated as part of this Consent Decree:

"Appendix A" contains the Test-and-Set Protocol for $NO_x$ Emission Limit requirements that apply to each Kiln under this Consent Decree subject to those requirements.

"Appendix B" contains the Environmental Mitigation Projects Requirements.

All terms in the Appendices shall be construed in a manner consistent with this Consent Decree.

## SECTION XXIX: HEADINGS

110.    Headings to the section and subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

Dated and entered this __4th__ Day of __October__ __2017_____.

_____
UNITED STATES DISTRICT COURT JUDGE
District of Nevada

**Signature Page to the Consent Decree in *United States v. Nevada Cement Company***

FOR PLAINTIFF UNITED STATES OF AMERICA:


Date: 3/20/17

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice



Date: _____

DAVID L. McILWAIN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1544 (Tel.)
(202) 514-0097 (Fax)
David.McIlwain@usdoj.gov

**Signature Page to the Consent Decree in** *United States v. Nevada Cement Company*

FOR PLAINTIFF UNITED STATES OF AMERICA:

STEVEN W. MYHRE
Acting United States Attorney
District of Nevada

GREG ADDINGTON
Assistant United States Attorney
U.S. Attorney's Office
District of Nevada
100 West Liberty
Suite 600
Reno, Nevada 89501
(775) 784-5438
Greg.Addington@usdoj.gov

**Signature Page to the Consent Decree in *United States v. Nevada Cement Company***

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

Date: 3/6/17

LAWRENCE E. STARFIELD
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

Date: 3/1/17

SUSAN SHINKMAN
Director, Office of Civil Enforcement
United States Environmental Protection Agency

Date: 2/27/2017

PHILLIP A. BROOKS
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

Date: 2/22/17

ROBERT G. KLEPP
Attorney, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

57

**Signature Page to the Consent Decree in *United States v. Nevada Cement Company***

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY
REGION 9:


_____     Date: 30 Jan. 2017
ALEXIS STRAUSS
Acting Regional Administrator U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105


_____     Date: 1/30/17
IVAN LIEBEN
Attorney
Office of Regional Counsel


_____     Date: 1/30/2017
DAVID KIM
Attorney
Office of Regional Counsel

1   **Signature Page to the Consent Decree in *United States v. Nevada Cement Company***

2

3   FOR DEFENDANT NEVADA
4   CEMENT COMPANY:

5   *Joseph P. Sells*                                    Date:  01/23/2017
6   Joseph P. Sells
    President
7   Nevada Cement Company
    I-80 at Exit 46.  P.O. Box 840
8   Fernley, NV 89408-0840

9

10

11  The following is the name and address of Defendant Nevada Cement Company's agent for service
    pursuant to Paragraph 106.
12

13          Joseph P. Sells
            President
14          Nevada Cement Company
            I-80 at Exit 46.  P.O. Box 840
15          Fernley, NV 89408-0840

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    59

**Appendix A to Consent Decree**
**Test-and-Set Protocol For $NO_x$ Emission Limit**

### I.   Scope and Applicability

1.      Defendant shall comply with the requirements contained in this Appendix A regarding installation and optimization of selective non-catalytic reduction technology ("SNCR") and, if necessary, Low $NO_x$ Burners ("LNB") in establishing 30-Day Rolling Average Emission Limits for $NO_x$ for Kiln 1 and Kiln 2 at the Facility.

2.      If Kiln operation is disrupted by unplanned outages, or excessive startups and Shutdowns during the CEMS Installation and Operation Period, Baseline Collection Period, SNCR Optimization Period, or SNCR Demonstration Period, or if the Kiln temporarily ceases operation for business or technical reasons, Defendant may request that EPA extend the CEMS Installation and Operation Period, Baseline Collection Period, SNCR Optimization Period or SNCR Demonstration Period pursuant to Section XI (Review and Approval of Submittals). EPA shall grant or deny the request and shall state the amount of time (if any) that the CEMS Installation and Operation Period, Baseline Collection Period, SNCR Optimization Period, or SNCR Demonstration Period, may be extended, which decision is subject to the Section XV (Dispute Resolution) provisions of the Consent Decree. Defendant may not suspend the CEMS Installation and Operation Period, Baseline Collection Period, SNCR Optimization Period, or SNCR Demonstration Period until and unless EPA has granted the request. Data gathered during periods of disruption may not be used to determine any emission calculations or limitations unless both Defendant and EPA agree to use the subject data. All collected data shall be included in each applicable report.

### II.   CEMS Installation and Operation

1.      No later than December 31, 2017, Defendant shall complete installation on Kiln 2, a $NO_x$ continuous emissions monitoring system ("CEMS") certified and compliant with 40 C.F.R. Part 60. By February 1, 2018, Defendant shall complete installation of a $NO_x$ CEMS on Kiln 1 that is certified and compliant with 40 C.F.R. Part 60.

2.      Defendant shall install an Ammonia CEMS on Kilns 1 and 2 in conjunction with the installation of the $NO_x$ CEMS pursuant to Paragraph II.1 of this Appendix. The Ammonia CEMS shall be operated whenever the $NO_x$ CEMS is used during baseline testing and the test-and-set processes.

## III. Baseline Collection Period

1. Defendant shall use CEMS to collect emissions data for $NO_x$ and Ammonia from the Kilns. Defendant shall monitor and collect operational data as discussed in Paragraph III.2.a of this Appendix.

2. The Baseline Collection Period shall begin within 30 days after installation of Ammonia CEMS and certified $NO_x$ CEMS on each Kiln. The duration of the Baseline Collection Period shall last for 120 Operating Days and be undertaken during periods of Kiln Operation.

   a. The data collected during the Baseline Collection Period and through to the end of the SNCR Demonstration Period or the LNB Demonstration Period shall include the following data derived from available direct monitoring or estimated from monitored or measured data:

      i. Kiln flue gas temperature at the inlet to the fabric filter or at the Kiln stack (daily average);

      ii. Kiln production in Tons of clinker (daily total) and the method used to calculate Kiln production;

      iii. Raw material feed in Tons (daily total);

      iv. Type and percentage of each raw material used (daily);

      v. $NO_x$, $SO_2$, and Ammonia concentrations (dry basis) and mass rates of $NO_x$ and $SO_2$ for Kilns 1 and 2;

      vi. Flue gas volumetric flow rate (daily average in dry acfm);

      vii. Feed burnability (C3S) (at least daily);

      viii. Temperatures in or near the burning zone (by infrared or optical pyrometer);

      ix. Kiln system fuel feed rate and type of fuel by weight or heat input rate (calculated to a daily average);

      x. Kiln amps (daily average);

      xi. Kiln back end $O_2$ concentration (daily average);

xii.     Kiln system draft fan settings;

xiii.     Documentation of any Startup, Shutdown, or Malfunction events; and

xiv.     An explanation of any gaps in the data or missing data.

b.     The Defendant shall submit a Baseline Collection Report for each Kiln within 30 days after the deadline for the end of the Baseline Collection Period on each Kiln. The Baseline Collection Report shall include the data collected during the Baseline Collection Period and a calculation of the Baseline $NO_x$ Emissions as defined in Paragraph 8.e of Section III (Definitions).

c.     Hours or days when there is no Kiln Operation shall be excluded from the calculation in Paragraph III.2.b of Appendix A. However, Defendant shall provide an explanation in the Baseline Collection Report for any data excluded and provide the excluded data in the Baseline Collection Report.

d.     When submitted, Defendant shall provide the data to EPA in the Baseline Collection Report in an electronic format, consistent with and able to be manipulated by Microsoft Excel, and shall explain the reasons for any data not collected for each of the parameters.

## IV. SNCR Design, Installation, Optimization, and Demonstration Requirements

1.     SNCR Design Report:

a.     Defendant shall submit to EPA for approval pursuant to Section XI (Review and Approval of Submittals) of the Consent Decree within 180 days from the Date of Entry, a design report for SNCR for Kiln 1 and Kiln 2 ("SNCR Design Report").

b.     Defendant shall design each SNCR system to be capable of delivering the proposed reagent at a maximum rate of at least 1.4 mols of reagent to 1.0 mols of $NO_x$ (1.4:1 molar ratio) at all times based on Baseline $NO_x$ Emissions collected pursuant to this Appendix A, and shall design each system consistent with vendor recommendations for reducing $NO_x$ emissions from each Kiln. The system shall be designed to inject Ammonia into the Kiln gas stream based upon the Ammonia Slip measured by the Ammonia CEMS.

c.     Defendant shall specify in the Design Report the reagent(s) selected, the location selected for reagent injection, and other design parameters. The design of the SNCR shall be based on maximum emission reduction effectiveness, good engineering judgment, vendor standards, available data, Kiln operability, and regulatory restrictions on reagent storage and use. Subsequent to EPA's approval of the 30-Day Rolling Average Emission Limits for $NO_x$, Defendant shall have the right to use any type or quantity of reagent, provided it continues to meet the final emission limit set using Ammonia.

d.     Any permit application that may be required under state or federal law for the SNCR shall be consistent with the approved Design Report.

2.     SNCR Optimization Protocol:

a.     Defendant shall submit to EPA for approval pursuant to Section XI (Review and Approval of Submittals) of the Consent Decree within 60 days of submittal of the SNCR Design Report a protocol (the "SNCR Optimization Protocol") for optimizing each SNCR, including optimization of the operational parameters resulting in the minimization of emissions of $NO_x$ to the greatest extent practicable without violating any limits for other pollutants. If EPA's action taken pursuant to the Section XI (Review and Approval of Submittals) provisions of this Consent Decree is more than 90 Days after EPA's receipt of the SNCR Optimization Protocol specified above, the applicable deadline to commence optimization of the SNCR units, specified in Paragraph IV.3 of this Appendix A, below, shall be extended by the same number of Days that EPA's action exceeds the 90 days from the date Defendant submits the SNCR Optimization Protocol.

b.     The SNCR Optimization Protocol shall describe procedures to be used during the optimization period ("SNCR Optimization Period") for each SNCR to optimize the different Facility processes to minimize emissions and adjust the Kiln and SNCR operating parameters, and shall include the following:

      i.     Measures to optimize the Facility's processes to reduce $NO_x$ emissions in conjunction with SNCR (the "SNCR Optimization Measures"), which shall include at a minimum, fuel fineness, primary, secondary air rates injected into the Kiln, and adjustments to the raw mix such as fineness and composition;

63

ii.     The method Defendant will use to calculate Ammonia Slip according to Paragraph 8.d of this Consent Decree;

iii.     Measures to optimize the SNCR using the Ammonia Slip measurement at each Kiln. These measures shall include attempting to maintain an Ammonia Slip concentration of 2 to 6 ppm on a daily average basis or alternative equivalent measures of using Ammonia Slip to control the SNCR operation rate; and

iv.     Measures to be taken if optimization of the SNCR causes operational problems or excess emissions of a pollutant other than $NO_x$.

3.     SNCR Installation and Commencement of Operation:

    a.     For Kilns 1 and 2, Defendant shall complete installation of SNCR no later than 365 days following submission of the Baseline Collection Report for each Kiln and commence the approved SNCR Optimization Protocol as of the date of such installation.

    b.     Defendant shall commence Continuous Operation of each SNCR in accordance with the approved Optimization Protocol by adding reagent to the SNCR system.

4.     SNCR Optimization Period:

    a.     Defendant shall make its best efforts to establish the optimized steady-state operation of each SNCR as soon as practicable.

    b.     For Kilns 1 and 2, optimization of the SNCR's and the Facility's processes shall be completed within 270 days following the deadline for SNCR installation.

    c.     For each Kiln, Defendant shall collect the data identified in Paragraph III.2.a of Appendix A during the SNCR Optimization Period. When submitted, Defendant shall provide the data to EPA in an electronic format consistent with and able to be manipulated by Microsoft Excel and explain the reasons for any data not collected.

    d.     During each SNCR Optimization Period, Defendant shall operate each Kiln in a manner necessary to produce a quality cement clinker product

64

and shall use good air pollution control practices for minimizing emissions at all times.

e.  For each Kiln, Defendant shall continue to collect the data specified in Paragraph III.2.a of Appendix A after the SNCR Optimization Period.

5.  SNCR Optimization Report:

a.  Within 60 Days following the end of the SNCR Optimization Period for each Kiln, Defendant shall submit to EPA for approval pursuant to Section XI (Review and Approval of Submittals) of the Consent Decree an optimization report ("SNCR Optimization Report") for that Kiln. The Optimization Report shall:

i.   Demonstrate conformance with the SNCR Optimization Protocol for the Kiln and its associated SNCR system;

ii.  Include all data collected during the SNCR Optimization Periods;

iii. Propose, for approval, consistent with the SNCR Optimization Protocol, the optimized operating parameters for the Kiln and the SNCR system to be maintained during the SNCR Demonstration Period; and

iv.  Propose steps to be taken to maintain an Ammonia Slip of between 2 and 6 ppm on a daily average basis or an alternative method of using Ammonia Slip data to control the SNCR operation during the Demonstration Period.

b.  In identifying the optimized state of each SNCR, including the injection rates of reagents, and the operating parameters for the Facility processes, Defendant may take into account energy, environmental, and economic impacts and other costs.

c.  The SNCR Optimization Report may also include a discussion of any problems encountered during the SNCR Optimization Period, and how that problem may impact the potential emission reductions (including the quantity of reagent slip at varying injection rates and/or the possible observance of a detached plume above the Stack).

d.  In the event Defendant determines, prior to the expiration of the SNCR Optimization Period, that its ability to optimize the Kiln and/or its SNCR system will be affected by potential impairments to product quality, Kiln system reliability or increased emissions of other pollutants, then Defendant shall promptly advise EPA of this determination, and include these considerations as part of its recommendation in its SNCR Optimization Report.

6.  SNCR Demonstration Period:

a.  The SNCR Demonstration Period for each Kiln shall commence within 7 days after Defendant's receipt of the final approval by EPA of the SNCR Optimization Report for the relevant Kiln.

b.  The SNCR Demonstration Period shall last 270 Operating Days.  During the SNCR Demonstration Period, the Kiln shall be operated consistent with the optimized operations of the Facility's processes and the SNCR system as approved by EPA as part of the SNCR Optimization Report.

c.  Subject to Section XV (Dispute Resolution) and through written notice to Defendant, EPA may itself extend or reopen the SNCR Demonstration Period based upon a determination that additional data is needed to be able to adequately establish an emission limitation.

d.  If evidence arises during the SNCR Demonstration Period that product quality, or Kiln system reliability is impaired, then Defendant may, upon notice to, and approval by, EPA, temporarily modify Kiln operation and the SNCR system to mitigate the impairment and request that EPA suspend or extend the SNCR Demonstration Period for further technical evaluation of the effects of process optimization on the Kiln or SNCR system or, alternatively, permanently modify the manner of operation of the Kiln or SNCR system to mitigate the effects.

e.  During the SNCR Demonstration Period for each Kiln, Defendant shall collect the same data as required in Paragraph III.2.a of Appendix A.

7.  SNCR Demonstration Report:

a.  Within 60 Days following completion of the SNCR Demonstration Period for each Kiln and its associated SNCR, Defendant shall submit a demonstration report to EPA ("SNCR Demonstration Report") for that Kiln.  The SNCR Demonstration Report shall include all of the data

collected during the SNCR Demonstration Period and the proposed 30-Day Rolling Average Emission Limit for $NO_x$ for each Kiln.

b.  For the purposes of the SNCR Demonstration Report:

   i.  The 30-Day Rolling Average Emission Limit for $NO_x$ for each Kiln shall be based upon an analysis of CEMS data and clinker production data collected during the SNCR Demonstration Period while the Facility's processes and SNCR system parameters were optimized consistent with the SNCR Optimization Report, Appendix A.IV.5 of the Consent Decree.

   ii.  Total pounds of $NO_x$ emitted during an individual Operating Day will be calculated from collected CEMS data for that Operating Day.

   iii.  Hours or days when there is no Kiln Operation may be excluded from the calculation in Paragraph IV.7.c of Appendix A below. However, Defendant shall provide an explanation in the SNCR Demonstration Report for any data excluded and include the excluded data in the Demonstration Report.

   iv.  All $NO_x$ data when hourly Ammonia Slip is less than 2 ppm or greater than 6 ppm may be used for daily $NO_x$ average calculation. For any days where the daily Ammonia Slip averages less than 2 ppm or greater than 6 ppm, Defendant shall provide justification for use of that data for use in determination of the 30-Day Rolling Average Emission Limit for $NO_x$ for each Kiln. EPA reserves the right to eliminate any data outside the parameters of the Optimization Report from the final 30-Day Rolling Average Emission Limit.

c.  The final 30-Day Rolling Average Emission Limit for $NO_x$ for each Kiln shall be calculated in accordance with the following formula:

$X = \mu + 1.65\sigma$ where:

$X$ = 30-Day Rolling Average Emission Limit (lbs/Ton of clinker)

$\mu$ = arithmetic mean of all of the 30-Day rolling averages

$\sigma$ = standard deviation of all of the 30-Day rolling averages, as calculated in the following manner:

67

$$\sigma = \sqrt{\frac{1}{N} \sum_{i=1}^{N} (x_i - \bar{x})^2}$$

d.     EPA shall either approve the proposed 30-Day Rolling Average Emission Limits for $NO_x$ or establish an alternative 30-Day Rolling Average Emission Limits. If EPA establishes an alternative 30-Day Rolling Average Emission Limit for $NO_x$ for one or both of the Kilns, Defendant will begin to meet the alternative 30-Day Rolling Average Emission Limit for $NO_x$ within 30 days of receiving notice of the limits from EPA, unless Defendant invokes dispute resolution according to the Section XV (Dispute Resolution) provisions of the Consent Decree in which case the final $NO_x$ limit shall be the 30-Day Rolling Average agreed to by the Parties at the conclusion of Informal Dispute Resolution. If Informal Dispute Resolution does not resolve the dispute, Defendant shall comply with its Proposed final $NO_x$ emissions limit until a final $NO_x$ Emissions Limit is determined by the Court.

e.     Subsequent to EPA's approval of the final 30-Day Rolling Average Emission Limits for $NO_x$, Defendant shall have the right to use any type or quantity of reagent, provided that Defendant continues to comply with the 30-Day Rolling Average Emission Limit for $NO_x$.

f.     Supporting data required to be submitted under this Appendix A may contain information relative to Kiln operation and production that Defendant may consider to be proprietary. In such a situation, Defendant may submit the information to EPA as CBI, subject to the provisions of 40 C.F.R. Part 2.

g.     If the final 30-Day Rolling Average Emission Limit for $NO_x$ is established at 40% or more below Baseline $NO_x$ Emissions, no further action shall be required under this Appendix A.

## V.  LNB Installation and Optimization Requirements

1.    LNB Vendor Selection Report

a.      Within 120 days after EPA's demand that Defendant install an LNB pursuant to Paragraph 14 of this Consent Decree, Defendant shall submit an LNB Design Report that explains the reasons Defendant has selected the recommended vendor(s) and includes information from the recommended vendor(s) on expected LNB design and associated $NO_x$ reductions for both Kilns. Any vendor(s) and design chosen must design the LNB with the aim of achieving the result of at least 15% $NO_x$ reduction from the Kiln(s) post SNCR installation and operation. The LNB Design Report will set forth the design specifications of the selected LNB system and the operating parameters and equipment adjustments to be made to the LNB system and, if necessary, the SNCR systems during the LNB Optimization Period necessary to attain emission reductions.

2.    LNB Installation and Commencement of Operations

a.      Within the time frame established pursuant to Paragraph 15, Defendant shall complete installation of LNB on Kilns 1 and/or 2, as specified ("LNB Installation").

b.      Defendant shall install the LNB system consistent with the selected vendor design and operate each LNB in accordance with the LNB Design Report.

3.    LNB Optimization Protocol

a.      Consistent with the LNB Design Report, optimization of the LNBs on Kiln 1 and Kiln 2 shall be completed no later than 4 months from LNB Installation (the "LNB Optimization Period"). Defendant shall make its best efforts to establish the optimized steady-state operation of the LNB as soon as practicable.

b.      During the LNB Optimization Period, Defendant shall operate each Kiln in a manner necessary to produce a quality cement clinker product and shall use good air pollution control practices for minimizing emissions at all times. The SNCR shall Continuously Operate during the LNB Optimization Period.

4.    LNB Data Collection and Submission

a.      The data collected during the LNB Optimization Period shall include the data specified in Section III.2.a of this Appendix A.

69

b. The data collected during the LNB Optimization Period shall be submitted to EPA within one month after the end of the Period as part of an LNB Optimization Report according to the detail and format specified by this Section. The LNB Optimization Report shall also describe how Defendant met the installation and operating parameters and specifications set forth in the LNB Design Report.

c. When submitted, Defendant shall provide the data to EPA in an electronic format, consistent with and able to be manipulated by Microsoft Excel, and shall explain the reasons for any data not collected for each of the parameters.

5. LNB Demonstration Period

a. To establish a revised final $NO_x$ 30-Day Rolling Average Limit based upon operation of the LNB and the SNCR, Defendant shall duplicate and comply with all applicable requirements of Section IV.6 of this Appendix A, except the LNB Demonstration Period shall last 180 Operating Days.

6. LNB Demonstration Report

a. Defendant shall submit a demonstration report to EPA for approval for that Kiln within 60 Days following completion of the LNB Demonstration Period and comply with all applicable requirements of Section IV.7 of this Appendix A including proposing for approval under Section XI (Review and Approval of Submittals), a revised final 30-Day Rolling Average Emission Limit. Under no circumstance may this proposed revised final limit be less stringent than the limit proposed and/or approved pursuant to the SNCR Demonstration process. The SNCR shall Continuously Operate during the LNB Demonstration Period.

## Appendix B to Consent Decree:
## Environmental Mitigation Projects

In compliance with and in addition to the requirements in Section VII (Other Injunctive Relief) of this Consent Decree, Defendant shall comply with the requirements of this Appendix B to ensure that the benefits for the federally directed Environmental Mitigation Projects below are achieved.

### Clean Diesel Engine Replacement Projects

1. Defendant shall replace an existing heavy-duty diesel truck with a new heavy-duty diesel truck subject to the emission standards set forth at 40 C.F.R. § 86.007-11, at a cost of not less than $120,000. Defendant shall also replace an existing rail car mover with a Tier 0 or Tier 1 engine with a new rail car mover with a Tier 4 engine subject to the emission standards set forth at 40 C.F.R. Part 1039, at a cost of not less than $300,000.

2. The replaced engines will be located at Defendant's Fernley facility and related quarries, and between those locations. Defendant shall complete the requirements within two (2) years after the Effective Date.

3. Defendant shall provide a mechanism by which each replaced engine in Paragraph 1 of this Appendix B above is properly disposed of, which must include destruction of the engine block.

4. Nothing in this Consent Decree shall be interpreted to prohibit Defendant from completing any of the Projects ahead of schedule.

5. In accordance with the requirements of Section XII (Reporting Requirements) of the Consent Decree, within sixty (60) Days following the completion of each Project, Defendant shall submit to U.S. EPA for approval a report that documents:

    a. The date the replacement was completed;

    b. The results of implementation of the replacement, including the estimated emission reductions or other environmental benefits achieved; and

    c. The cost incurred by Defendant in implementing the replacement.